[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-12291

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

HANNIBAL MOORE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Alabama
D.C. Docket No. 1:19-cr-00028-JB-N-1

_____

Before LAGOA, BRASHER, and ED CARNES, Circuit Judges.

ED CARNES, Circuit Judge:

Hannibal Moore was charged with one count of being a felon in possession of a firearm. He had a two-day trial at which he testified, asserting a justification defense. The jury rejected that defense, finding him guilty. The district court denied his motion for a judgment of acquittal or a new trial. After calculating a guidelines range of 100 to 120 months, the court sentenced him to 80 months imprisonment. He challenges his conviction and his sentence.

## I.    BACKGROUND FACTS AND PROCEDURAL HISTORY

On the last weekend of October in 2017, Hannibal Moore and his then-girlfriend Samaria Howle traveled from Mobile to Birmingham, Alabama. On that Saturday, while they were driving in the Birmingham area, police officers stopped them for a traffic violation. The officers saw that Samaria had bruises on her face and arms.[1] After photographing her bruises, the officers arrested Moore for domestic violence and took him to jail.

Samaria called her sister and her brother-in-law, Jerry Coxwell, and asked them to come meet her in Birmingham. They did, and the three of them traveled from there back to Mobile in two separate vehicles. Although she had been allowing Moore to

---

[1] We refer to Samaria Howle by her first name to distinguish her from her ex-husband, Andrew James Howle, who also plays a role in this case.

live at her house, Samaria decided that she didn't want him to return there and asked Coxwell to change the locks on the doors of her house. He did that by swapping the locks on his house for those on her house.

Still, the next night, Samaria let Moore use her debit card to purchase a bus ticket from Birmingham back to Mobile. She picked him up at the bus station in Mobile. At first, she wanted him to get his belongings and leave her house, but she changed her mind and decided to let him stay the night.

At about midnight, Samaria's ex-husband, Andrew James Howle, rang Samaria's doorbell. Samaria's sister had told him about Samaria having been beaten, and Howle wanted to check on her. When Samaria opened the door, he saw that her face was bruised and injured. But she told him that she was fine and that he should leave. But then Moore came to the door and, according to Samaria, the two men "had words" and were "hollering" at each other. At one point Moore told Howle, "I'm a hoe beater."[2]

Howle left, but within 30 minutes to two hours later he returned to the house with Coxwell.[3] They knocked on the door and

---

[2] The transcript records that the testimony was that Moore had said "hoe," but we doubt that the proclivity he had expressed was for assaulting a particular type of garden tool. Hoe appears to be an alternative spelling of the derogatory and misogynistic term "ho." *See United States v. Murphy*, 406 F.3d 857, 859 n.1 (7th Cir. 2005) (interpreting "hoe" in a transcript to mean "ho").

[3] The testimony varies about the amount of time that passed before Howle returned to the house with Coxwell. Howle testified that it was 30 minutes to

rang the doorbell, but no one answered. Samaria "figured" Howle had returned; she didn't know who else it could be. Moore looked out the window and thought he saw three men outside, one with a shotgun, but he testified that at the time he didn't know who the men were. Whoever they were, according to Moore he thought they were going to come in and kill him. But he didn't call 911.

Instead, he told Samaria to get the firearm that she had recently purchased. She wanted to go see who was outside, but Moore blocked her at the bedroom door and insisted that she get her gun. She told him that she didn't want to get the gun, but she finally complied with his demands and got it.

Samaria and Moore walked toward the front door with Samaria holding the gun and Moore behind her. The house was dark, with all the lights turned off. Moore was "very panicky," and Samaria was scared someone would hurt him, although she didn't fear for her own safety. What happened next happened very quickly.

They heard someone coming into the house through the back door. They turned, and Moore grabbed the pistol from Samaria and shot a man in the groin. That man was Coxwell, who

---

an hour later. Moore testified that it was 45 minutes after the first visit. Samaria testified that it was about 2:00 a.m., which would have made it almost two hours after Howle's first visit to the house. In all of the varying accounts, it was no more than two hours after his first visit.

had entered the house by using his key to open the back door. There was no forced entry.

Moore put the firearm on the sofa and called 911. Coxwell ran around to the front of the house where Howle was waiting. Howle called 911 and took Coxwell to the hospital. When the police arrived, Moore talked to them, and an officer's body camera recorded the conversation.[4] At one point Moore told the officers that Samaria was the one who had shot Coxwell. At another point, he told the officers that he was the one who had shot Coxwell. In addition, Moore also made some strange statements, including one about doing "a drive-by with a missile launcher," which led the officer to believe that Moore was agitated and probably drunk. Samaria testified that Moore had been drinking and doing drugs that night. He admitted to drinking but not to doing drugs.

Moore was indicted on one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). He conceded that he was a felon and that the firearm had traveled in interstate commerce. He proceeded to trial, challenging the possession element of the charged § 922(g) offense and asserting a justification defense. After the government rested its case-in-chief, Moore testified. He reluctantly admitted on cross-examination that he had possessed the firearm and had shot Coxwell. When pressed about

---

[4] Some footage from the body camera recording was introduced at trial, and Officer Riley Stewart testified about it. Moore does not challenge the admission of that evidence.

his statement to police that Samaria had been the one who shot Coxwell, he said: "In a way, it was [true], because when I reached for the gun, both our hands were kind of still on the gun. I snatched it and it went off." Regardless of his reluctance to admit possession, all of the elements of the offense were ultimately undisputed. The dispute was about the justification defense.

After a two-day trial, the jury rejected that defense and found Moore guilty. He moved for judgment of acquittal, or in the alternative for a new trial, both of which the district court denied. The court calculated a guidelines range of 100 to 120 months and sentenced him to 80 months imprisonment.

## II.    DISCUSSION

Moore challenges his conviction on six grounds, his sentence on two.

### A.    Justification Defense: Motion for Judgment of Acquittal or New Trial

Moore was charged with, tried for, and convicted of one count of being a felon in possession of a firearm. It is unlawful for anyone who has been convicted of "a crime punishable by imprisonment for a term exceeding one year . . . to . . . possess in or affecting commerce, any firearm or ammunition." 18 U.S.C. § 922(g)(1). Every element of that offense was satisfied here.[5]

---

[5] As we have mentioned, Moore briefly disputed the fact that he had possessed the pistol, but later dropped that contention because the evidence showed that

Moore's affirmative defense of justification was his basis for challenging the felon in possession charge at trial and is his basis for attacking his conviction. He contends that the district court should have found that he established a justification defense and granted him a judgment of acquittal or, alternatively, a new trial.

Section 922(g) is a general intent crime, and "the defendant's motive or purpose behind his possession is irrelevant." *United States v. Vereen*, 920 F.3d 1300, 1308 (11th Cir. 2019). A defendant who has committed this crime can assert an affirmative defense of justification (also called "necessity"), but it applies "only in extraordinary circumstances." *Id.* at 1310; *see also United States v. Deleveaux*, 205 F.3d 1292, 1297 (11th Cir. 2000). To establish a justification defense to a § 922(g)(1) charge, Moore had the burden of showing that:

> (1) [he] was under unlawful and present, imminent, and impending threat of death or serious bodily injury; (2) [he] did not negligently or recklessly place himself in a situation where he would be forced to engage in criminal conduct; (3) [he] had no reasonable legal alternative to violating the law; and (4) . . . there was a direct causal relationship between the criminal action and the avoidance of the threatened harm.

---

he grabbed it from Samaria and used it to shoot Coxwell. *See United States v. Vereen*, 920 F.3d 1300, 1309 (11th Cir. 2019) (recognizing that "the purpose behind a defendant's possession [of the firearm] is irrelevant, which means that he cannot defend against the [felon in possession] crime based on the 'innocent' or 'transitory' nature of his possession").

*Vereen*, 920 F.3d at 1310–11 (quoting *Deleveaux*, 205 F.3d at 1297).

Moore raises three arguments about his justification defense and the district court's judgment denying him a new trial or a judgment of acquittal. First, he contends that the district court applied the wrong standard because in the section of its order denying him a new trial, the court cited some decisions that involved motions for judgment of acquittal. Second, he contends that he is entitled to a new trial because the jury's verdict was against the great weight of evidence. Third, almost in passing, he contends that he is entitled to a judgment of acquittal because his justification defense made the evidence insufficient to support the verdict.

1.  The Standards for Granting a Judgment of Acquittal or New Trial

Federal Rule of Criminal Procedure 29 provides that a defendant is entitled to a judgment of acquittal if "the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). And Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).

When considering a Rule 29(a) motion for a judgment of acquittal, the evidence is viewed in the light most favorable to the prosecution and all reasonable inferences and credibility choices are drawn in its favor. *See United States v. Fleury*, 20 F.4th 1353, 1367 (11th Cir. 2021); *United States v. White*, 663 F.3d 1207, 1213

(11th Cir. 2011). A Rule 33(a) motion for a new trial is different because "the district court may weigh the evidence and consider the credibility of the witnesses." *United States v. Brown*, 934 F.3d 1278, 1297 (11th Cir. 2019) (quotation marks omitted). But "the court may not *reweigh* the evidence and set aside the verdict simply because it feels some other result would be more reasonable." *United States v. Gallardo*, 977 F.3d 1126, 1140 (11th Cir. 2020) (quotation marks omitted) (emphasis added).

"A motion for a new trial based on the weight of the evidence is 'not favored' and is reserved for 'really exceptional cases.'" *Brown*, 934 F.3d at 1297 (quoting *United States v. Martinez*, 763 F.2d 1297, 1313 (11th Cir. 1985)). "A district court may grant a new trial based on the weight of the evidence even if the evidence is sufficient to convict in the *rare* case in which the evidence of guilt although legally sufficient is thin and marked by uncertainties and discrepancies." *Id.* at 1298 (quotation marks omitted) (emphasis added). While we review for an abuse of discretion the grant or the denial of a new trial, we give denials greater deference. *United States v. Cox*, 995 F.2d 1041, 1044 (11th Cir. 1993) ("[W]e have, not surprisingly, accorded grants of such motions less deference than denials."). That makes sense because when a court grants a new trial in a criminal case where the jury has found the defendant guilty beyond a reasonable doubt, it is deciding "that the jury was wrong and that the evidence weighed heavily against the verdict of twelve men and women honest and true." *Id.*

After the jury returned a guilty verdict against Moore, he sought a judgment of acquittal under Rule 29 or, in the alternative, a new trial under Rule 33. He first argued "that a judgment of acquittal may be based on the sufficiency of the evidence as to his justification defense." He asserted that he "provided proof of his justification defense by a preponderance of the evidence, and no reasonable jury could have concluded otherwise." Then he argued for a new trial, asserting that "the great weight and preponderance of the evidence at trial supported all elements of [his] justification defense." He relied on the same evidence and basically the same arguments he had advanced in his request for a judgment of acquittal. The court concluded that Moore had not met his burdens under either Rule 29 or Rule 33 and that "[j]ustice requires that the guilty verdict returned against [him] stand." It denied Moore's motion.

2.  Moore Failed to Establish That He Was Entitled to a Judgment of Acquittal or a New Trial.

Moore argues that the district court mixed up the Rule 29 and Rule 33 standards, but it didn't, and Moore has failed to establish that he was entitled to either a judgment of acquittal or a new trial. The district court recognized that Moore was asking for those alternative forms of relief. Its order correctly recited the separate and distinct standards, analyzing the two alternative requests in separate sections of its order.

The district court did cite and rely on some sufficiency of the evidence decisions in its new trial analysis. But the court did so

only after recognizing that, in seeking a new trial under Rule 33, Moore was challenging the sufficiency of the evidence and was relying "on the same arguments rejected in his Rule 29(a) [judgment of acquittal] motions." And the court cited the sufficiency of the evidence decisions for just that — how courts should consider sufficiency of the evidence, including credibility determinations. The court did not cite those decisions as the standard for granting a new trial; instead, the order's "standard of review" section accurately recited the standards for granting a new trial under Rule 33. The court recognized that a new trial is justified if, but only if, the evidence preponderates so heavily against the jury's verdict that it would be a miscarriage of justice to let the verdict stand. *See Cox*, 995 F.2d. at 1043.

Whether we are reviewing a district court's denial of a judgment of acquittal or denial of a new trial, we have recognized the essential role of the jury in making credibility determinations. *See United States v. Green*, 981 F.3d 945, 960 (11th Cir. 2020) (reviewing the denial of both types of relief and stating that "[t]o the extent the appellants' arguments challenge the credibility of various witnesses, credibility determinations are exclusively within the province of the jury"). Credibility determinations are given great weight in both contexts. Sufficiency of the evidence matters in both contexts.

By the end of the two-day trial, it was undisputed that Moore was guilty of each of the elements of being a felon in possession of a firearm. As we have said, the only dispute was about whether he

had proven his affirmative defense of justification.  The jury heard conflicting accounts about that defense from different witnesses, including Moore himself, and plenty of the testimony undermined his justification defense theory.  The jury was free to make its own credibility determinations.  "We have even held that because a jury is free to infer from a testifying defendant's demeanor that he is not telling the truth, a statement by a defendant, if disbelieved by the jury, may be considered as substantive evidence of the defendant's guilt when combined with other evidence." *See, e.g.*, *United States v. Pon*, 963 F.3d 1207, 1234 (11th Cir. 2020) (quotation marks omitted).  "This is especially true in regard to highly subjective elements such as the defendant's intent or knowledge." *Id.* (quotation marks omitted).  Those same principles apply to the inferences a jury makes when considering a testifying defendant's intent or knowledge for purposes of the elements of an affirmative defense.

When considering Moore's justification defense and particularly whether the evidence showed the disqualifier that he had "negligently or recklessly place[d] himself in a situation where he would be forced to engage in criminal conduct," *Vereen*, 920 F.3d at 1311 (quoting *Deleveaux*, 205 F.3d at 1297), the jury was free to disbelieve him.  The jury heard testimony that when Samaria's ex-husband Howle came to the house, Moore escalated the situation by coming to the door and arguing with him.  Howle testified that Moore proclaimed himself to be a "hoe beater."  The jury could have reasonably found that if Moore had felt seriously threatened by Howle, he could have called 911 at that time.  Instead, Moore

allowed himself to be involved in a heated argument and contributed to the circumstances that later led him to engage in the criminal conduct of possessing the firearm. *See id.*

Samaria testified that Moore had been drinking and doing drugs that night, and although he denied the drugs he admitted to the drinking. There was evidence for a reasonable jury to find that Moore's judgment and self-restraint may have been impaired, contributing to a finding that he "negligently or recklessly place[d] himself in [the] situation" that led to his criminal possession of the firearm. *Id.* (quoting *Deleveaux*, 205 F.3d at 1297).

And there was more evidence that Moore caused the situation to escalate. When Howle returned to the house late that night with Coxwell, Moore had another opportunity to call 911. But he didn't. And he refused to let Samaria investigate the situation, even though it was her house and she had only begrudgingly given him permission to stay the night after he had been arrested for domestic violence against her the day before. He blocked Samaria inside the bedroom and insisted that she get her firearm. When Coxwell used his key to enter the house, Samaria was holding the gun, but Moore grabbed it from her and shot him. Only then did Moore finally call 911.

Based on the evidence presented, the jury could have reasonably found that if Moore had allowed Samaria to resolve the situation on her own, she would have made her own decision about whether she wanted to discharge her own firearm in her

own house. Instead, he took over and escalated the situation, grabbed the firearm, and shot a man with it.

Moore testified that he didn't know who had arrived at the house at 2:00 a.m., but the jury wasn't required to believe that or anything else he said. Reasonable jurors could have found that Moore knew Howle had returned along with friends or relatives because of Howle's concern for Samaria after he learned she had been beaten. That is what Samaria believed. And reasonable jurors could have found that, despite Moore's explanations, he created the conditions that led to his unlawful possession of the firearm. *See Vereen*, 920 F.3d at 1311.

Jurors could consider Moore's testimony in light of the testimony from other witnesses, video evidence from his interaction with police after the shooting, and his demeanor on the stand. During his testimony, Moore was asked about the fact that he had initially told the police that Samaria shot Coxwell. Confronted with that, he hedged: "In a way, it was [true], because when I reached for the gun, both our hands were kind of still on the gun." The jury could have reasonably found, as its verdict reflects, that Moore was telling the truth only "[i]n a way," and not much of a way at that.

The jury also could have reasonably found, as its verdict reflects, that there was no "direct causal relationship between the criminal action [of grabbing and illegally possessing the firearm] and the avoidance of the threatened harm." *Vereen*, 920 F.3d at 1311 (quoting *Deleveaux*, 205 F.3d at 1297). That's because Samaria was in charge of her own firearm, and Moore could have

allowed her to handle the situation that was evolving at her own house in the way she saw fit. The jury could have reasonably found, as its verdict reflects, that there was no necessity — no justification — for Moore's persistence in escalating the situation.

As Samaria told the jury: "So he kept persisting, persisting about not letting me go to the door and wanted me to get the gun. So, finally, I said, okay; I will get it, but I'm going to be the one that holds it and goes to the door to see what is going on out there." But Moore prevented Samaria from attempting to resolve the matter peacefully. He did so by initially stopping Samaria from leaving her bedroom, by "persisting, persisting" that she go and get the firearm, and, once she gave in to his demands, by grabbing the firearm from her and firing it.

The purpose of § 922(g) is "to keep guns out of the hands of convicted felons." *Vereen*, 920 F.3d at 1308. As the Supreme Court described: "Congress sought to keep guns out of the hands of those who have demonstrated that they may not be trusted to possess a firearm without becoming a threat to society." *Small v. United States*, 544 U.S. 385, 393 (2005). Moore is the kind of person Congress was concerned about: a convicted felon who possessed a gun and used it to shoot someone.

The jury heard Moore admit on cross-examination that he had been convicted of *another* felon in possession offense. And that conviction came less than two years before the trial in this case. Given all of the evidence it heard, the jury's finding that Moore's illegal possession of the firearm was not justified isn't a miscarriage

of justice.  *See Cox*, 995 F.2d. at 1043.  If the district court had granted the motion for a new trial, *that* would have been a miscarriage of justice.  *See id.*  The evidence was sufficient for the jury to reject his justification defense and find him guilty of being a felon in possession of a firearm, which precluded a judgment of acquittal.

B.    **The Admission for Impeachment Purposes of the Two Prior Convictions that Were More than Ten Years Old Does Not Require Reversal**

Moore contends that the district court erred by allowing the government to question him about two of his prior convictions because they were too old to be used for impeachment purposes.  The government also asked about his earlier felon in possession conviction, but that conviction was less than two years old, and Moore had no basis for challenging its admission, didn't do so at trial, and doesn't do so now.  His challenge is to the prosecutor questioning him at this trial in 2020 about his conviction for robbery in 2005 and his conviction for giving false information to a police officer in 2006.

We review *de novo* a district court's interpretation of the Federal Rules of Evidence but review its evidentiary rulings only for an abuse of discretion.  *United States v. Estrada*, 969 F.3d 1245, 1270 (11th Cir. 2020).  And, even if there is error, we will not reverse if the government meets its burden of showing that the error is harmless.  *See United States v. Phaknikone*, 605 F.3d 1099, 1109 (11th Cir. 2010).  "Reversal is warranted only if the error resulted in actual prejudice because it had substantial and injurious effect or

influence" on the jury's verdict. *Id.* (cleaned up). We can consider in the harmlessness analysis the overwhelming evidence of the defendant's guilt that exists regardless of an erroneous evidentiary ruling. *See id.*

1.  Whether the Two Convictions Were Stale for Rule 609(b) Purposes and Should Not Have Been Admitted for Impeachment

Generally, if a defendant opts to testify as a witness in his criminal trial, as Moore did, and he has a prior conviction for a felony, evidence of that conviction "*must be admitted*" for impeachment purposes "if the probative value of the evidence *outweighs* its prejudicial effect to that [testifying] defendant." Fed. R. Evid. 609(a)(1)(B) (emphasis added). But that subparagraph of Rule 609 does not apply to convictions when "more than 10 years have passed since the witness's conviction or release from confinement for it, whichever is later." Fed. R. Evid. 609(b). A previous conviction with that much age on it "*is admissible only if* . . . its probative value, supported by specific facts and circumstances, *substantially outweighs* its prejudicial effect." Fed. R. Evid. 609(b)(1) (emphasis added).[6]

That ten-year, stale-by dividing line in Rule 609(b) determines whether the probative value of the previous conviction has

_____

[6] Rule 609(b)(2) also requires that the proponent of admitting the conviction has given the other party "reasonable written notice" of its intent to use that

18                     Opinion of the Court                     21-12291

to "outweigh[]" the prejudicial effect or has to "substantially out-weigh[]" it.  And the difference between those two standards can make all the difference.  *See, e.g.*, *United States v. Pope*, 132 F.3d 684, 687 (11th Cir. 1998) (noting that Rule 609(b) "creates a strong presumption against the use . . . of stale convictions" to impeach a witness); *United States v. Mullins*, 562 F.2d 999, 1000 (5th Cir. 1977) (stating that "Rule 609(b) makes prior convictions generally inadmissible" if they are too old); *id.* (characterizing the "standards of Rule 609(a)" as "more lenient" and the "standards of Rule 609(b)" as "stricter"). [7]

The question here is how to calculate the starting line of a conviction's ten-year run to the stale-by finish line in Rule 609.  The rule says the ten-year period begins at the time of "*the witness's conviction or release from confinement for it, whichever is later.*" Fed. R. Evid. 609(b) (emphasis added).  That seems simple enough, but what does "release from confinement" mean?  More specifically, was a defendant who received a sentence consisting of imprisonment followed by probation "release[d] from confinement" for Rule 609 purposes when he finished serving the imprisonment part of his sentence or only when the probation part was over?

---

conviction.  There's no dispute that the government gave Moore that required notice.

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit issued before October 1, 1981.

This issue arose concerning Moore's 2005 robbery conviction and his 2006 conviction for giving false information to a police officer, which were introduced over his objection to impeach him when he testified at his 2020 trial in this case. The district court overruled Moore's Rule 609(b) objection to the admission of his 2005 and 2006 convictions for two reasons.

The court discussed the first reason when the issue came up at trial. The court ruled that probation was part of the custodial time or the custodial component of the sentence, which meant that the ten-year measurement under the rule did not begin to run until probation ended. (There is no dispute that the two prior convictions in question were less than ten years old for purposes of Rule 609(b) if the period of probation doesn't count toward the ten-year mark.) As a result, the probative value of each conviction had to outweigh the prejudicial effect but did not have to substantially outweigh it. The court understood that and found the probative value did outweigh the prejudicial effect.

We disagree with the district court's premise that probation counts as confinement under Rule 609(b). The three circuits that have addressed the issue have concluded that it does not. *United States v. Stoltz*, 683 F.3d 934, 939 (8th Cir. 2012) ("As our sister circuits have held, confinement for purposes of the ten-year time limit in Rule 609(b) does not include periods of probation. Rather, Rule 609(b)'s ten-year clock starts at the witness's release from any *physical* confinement, or in the absence of confinement, the date of the conviction.") (alteration adopted, quotation marks and citation

omitted); *United States v. Rogers*, 542 F.3d 197, 201 (7th Cir. 2008) ("[W]e hold that 'confinement' for purposes of the ten-year time limit in Rule 609(b) does not include periods of probation or parole."); *United States v. Daniel*, 957 F.2d 162, 168 (5th Cir. 1992) (same).

The Fifth Circuit was the first out of the gate on this issue, and its *Daniel* decision is persuasive. This is the reasoning that persuaded the Seventh Circuit (whose decision was followed by the Eighth Circuit) and also persuades us:

> The historical note to Rule 609 shows that, prior to 1972, the rule contemplated that the ten-year period should run from "the expiration of the period of his parole, probation, or sentence." This section was amended in 1972, however, and now states that a conviction is not admissible if more than ten years have elapsed since "release from confinement." The change in the language of the rule forecloses the interpretation urged by the appellants. Indeed, the [parties seeking to admit the prior conviction impeachment evidence] can point to no authority for their argument, save the mistaken dicta in [a district court opinion].

*Daniel*, 957 F.2d at 168 (footnote omitted). To which we would add: the rule says "confinement," not "restriction." Probation restricts, it does not confine. We join the Fifth, Seventh, and Eighth Circuits in holding that the ten-year stale-by measurement of Rule

609(b) is not delayed by a period of probation that follows the confinement part of a sentence.

2.    Whether Any Error in Admission of the Two Prior Convictions Was Harmless

When the issue about the two prior convictions came up again in Moore's post-verdict motion for a new trial, the district court added a second reason it believed that the 2005 robbery conviction and the 2006 false information conviction were admissible. The court stated that it "would have allowed the cross examination" about those two convictions "even if the higher standard of Rule 609(b)(1)" applied.

It would have, the court explained, because there was body camera video evidence at trial of Moore making statements to police officers after the shooting, and Moore had exercised his right to testify. Because of those things, his credibility "was a key factor to be assessed and determined by the jury." The court concluded that the significance of the credibility issue made the impeachment evidence especially probative, which persuaded the court that the evidence's probativeness "*substantially* outweigh[ed]" its prejudicial effect, satisfying the higher standard of Rule 609(b)(1).

That alternative reasoning shifts the focus to whether the district court correctly concluded that the probative value of the two convictions "substantially outweigh[ed]" their prejudicial effect. But that is a question we need not answer. We are convinced that even if the district court erred in determining that the

probative value of the two convictions did substantially outweigh the prejudicial impact and should not have allowed the two convictions to be admitted, the error in doing so was harmless.

It bears repeating that Moore is challenging on appeal the admission of only two convictions, one for robbery 15 years before the trial and the other for giving false information to a police officer 14 years before the trial. He has not challenged the admission of evidence that he was convicted for being a felon in possession of a firearm, a conviction that occurred less than two years before the trial.

More importantly, there can be no dispute that Moore was guilty of every element of his latest felon in possession of a firearm charge, the one that led to the conviction before us. Defense counsel admitted as much in closing arguments:

> [F]rankly, you've heard testimony that [Moore] had his hand on the gun; that he shot the gun; that he's a felon; the gun was in interstate commerce. I'm not sure what else there is that you need to get to the point where you need to just go ahead and consider whether the defense we've raised is a good defense or not a good defense because I think that — we think that's where the real question lies in this case.

And Moore also admitted as much through a stipulation and during cross-examination.

The jury had plenty of reasons to reject Moore's justification defense and his testimony intended to support it. On cross-

examination, he repeatedly gave non-responsive and evasive answers, and the court had to remind him 18 times to answer the question being asked. That had to have made a lasting impression on the jury about whether he was truthful. In that way, he impeached himself. He also admitted he had been drinking on the night of the shooting. And Samaria testified that he had taken drugs, although he denied that.

When pressed during cross-examination about whether his statement to police that Samaria had shot Coxwell was true, Moore could not bring himself to flat out admit that it wasn't. Instead, he testified that "[i]n a way, it was" true. He said that even though all of the evidence — including his own admissions during other parts of his cross-examination that he had fired the gun — showed his statement blaming Samaria was a lie.

Moore did admit during cross-examination that he did not call 911 at any time *before* he shot Coxwell. He didn't call when Samaria's ex-husband Howle came to the house at around midnight, and he didn't call when he claims to have seen three strange men outside at 2:00 in the morning, including, according to his testimony, one with a shotgun. He asserted that there wasn't time to call 911 when he saw someone outside with a shotgun because by the time the police arrived, he "would have been dead," but based on the evidence, the jury was free to discredit that testimony and reach a different conclusion.

Howle testified that neither he nor Coxwell was armed. Samaria was armed, but only at Moore's insistence, and Moore

grabbed the gun from her, having decided that he should be the one in control of it.  He deliberately armed himself.  He put himself in control of the firearm and the situation.

According to Samaria's testimony, someone (who turned out to be Coxwell) opened the back door and entered the house at 2:00 in the morning when the house was dark.  Samaria testified that: she was "very scared" when someone came in the back door of her house; it was dark, and she couldn't see who it was; and she was not afraid that someone would hurt her but was afraid someone would hurt Moore.  Those are extenuating circumstances.

But Moore's justification defense was weak at best; he offers no reason why he had to interpose himself in the situation.  There was no evidence that Samaria was unable to resolve it.  There *was* plenty of evidence that Moore blocked her effort to leave the bedroom so that she could address, and possibly defuse, the situation. He insisted that she get her firearm and then took it from her.  Any reasonable jury would have found that Moore had at least negligently or recklessly put himself into a situation where he wound up possessing, and using, a firearm.  And that rules out a justification defense, which was the only defense he put forward.  *See Vereen*, 920 F.3d at 1311; *Deleveaux*, 205 F.3d at 1297.

Because Moore was impeached by other means and because overwhelming evidence proved his guilt and disproved his only defense, any error in admitting the 2005 robbery and 2006 false information convictions was harmless.  *Phaknikone*, 605 F.3d at 1109.

### C.   The District Court Acted Within Its Discretion When It Allowed the Government to Refresh Samaria's Recollection by Showing Her, Before She Was Questioned About It, a Copy of Her Written Statement to the Police

The government wanted Samaria to testify as a witness, but before trial she had given some inconsistent statements. Because of that, the government filed a pre-trial motion asking the court to call Samaria as its own witness under Rule 614. *See* Fed. R. Evid. 614(a) ("The court may call a witness on its own or at a party's request. Each party is entitled to cross-examine the witness."). The government later told the court that no one really knew how Samaria was going to testify, and either the government or the defense might end up needing to impeach her.

The district court wanted to avoid stepping into the "role of fact prover" instead of being the "impartial arbiter of the rules." But defense counsel objected to having the court call Samaria as its own witness. As a compromise, the government proposed calling her as its witness, but it wanted both sides to have latitude about impeachment and wanted to use a prior statement to refresh her recollection. The court agreed to that approach.

During Samaria's testimony on direct examination, the government requested permission to refresh her recollection with a written statement she had given the police on the night of the shooting. Defense counsel objected, arguing that she shouldn't be shown her statement before she was questioned about it. The court overruled that objection.

Moore challenges that ruling. He contends that witnesses must testify based on their own personal knowledge, *see* Fed. Rule Evid. 602, and cannot "testify from prepared notes under the guise of refreshing recollection." But that's not what happened here.

The prosecutor asked Samaria if Moore had asked her to get her firearm the first time Howle came to her house. Samaria testified: "No. Not at that point." Then the prosecutor asked Samaria if she had given the police a written statement. When she said that she had, she was asked if reviewing it would refresh her recollection about what she had told the police the night of the shooting. When she said that it would, the prosecutor asked her to review her written statement. Moore objected, the court overruled the objection, and Samaria silently read part of her earlier statement to the police as the prosecutor had requested.

After she finished reading, Samaria testified: "[T]hat's not exactly how it went down." She went on to describe her memory of what had happened that night, including that Moore insisted she get her firearm after Howle returned to the house at 2:00 a.m. Nothing in the record indicates that Samaria was testifying based on "prepared notes." And Moore had a chance to cross-examine her about the testimony she gave after reading her written statement, which he did.

"We know of no prohibition forbidding witnesses from reviewing a prior statement before testifying." *United States v. Knight*, 867 F.2d 1285, 1289 n.5 (11th Cir. 1989). And "[t]rial courts have wide latitude in ruling on evidentiary questions." *United*

*States v. Bibbs*, 564 F.2d 1165, 1168 (5th Cir. 1977).  Not only that, but if any error did occur, it was harmless.  Samaria's in-court statements about the timing of when Moore told her to get the gun were consistent with his.  They both testified that Moore did not insist that she get her gun until Howle came back a second time at 2:00 a.m.  Allowing Samaria to refresh her recollection before testifying did not prejudice Moore; it was harmless.  *See Phaknikone*, 605 F.3d at 1109.

### D. The District Court Acted Within Its Discretion When It Admitted Evidence of Moore's Domestic Abuse of Samaria

Moore contends that evidence of domestic violence, which included photos of Samaria's injuries and testimony about his domestic violence arrest the day before the shooting occurred, amounted to bad acts or propensity evidence and shouldn't have been admitted.  He argues that the "domestic incidents involving Moore and Samaria" were too remote in time and too unrelated to the later altercations with Howle and Coxwell to be relevant to his justification defense.

#### 1.  The Domestic Violence Was Not Remote in Time

The domestic violence was part of the entire sequence of events that occurred over a short period of time.  Samaria testified that on Saturday, October 28, 2017, she and Moore traveled to Birmingham.  While there, they were stopped for a traffic violation, and Moore was arrested for domestic violence.  The police took photos of Samaria's bruises.  As we have mentioned, Samaria called

her sister and her brother-in-law to come to Birmingham, and the three of them travelled back to Mobile in two separate vehicles. She asked her brother-in-law to change the locks at her house, and he "exchanged" the locks on his house for hers.

Samaria first testified on direct examination that on Sunday night Moore took "an Uber or taxi" and ended up back at her house, though it's unclear from the record the precise time he arrived. On cross-examination, she admitted that she let him use her debit card to pay for his bus ticket to return to Mobile from Birmingham, and she picked him up at the bus station.

Samaria testified that she wanted Moore to get his belongings and leave her house, but then she decided to let him in and she decided to let him stay. Moore was at Samaria's house on the night of Sunday, October 29, which is when her ex-husband Howle knocked on the door. Howle had heard "what had happened" in Birmingham and came over to check on Samaria. He testified that he went to Samaria's house that night because her sister had called and told him Samaria had been beaten up "a couple days before," and he saw the bruises on her face when she opened the door.

Samaria testified that she told Howle she was fine and that he needed to leave, but Moore came to the door and he and Howle "had words." According to Howle, some of those words included Moore boasting, "I'm a hoe beater." Samaria recalled that Moore and Howle were "hollering back and forth at each other" as Howle was leaving. A couple of hours later at 2:00 a.m., Howle returned to the house with Coxwell on what was then the morning of

Monday, October 30, 2017.  That is when Moore illegally possessed Samaria's firearm and shot Coxwell.

Moore's grabbing the gun and shooting of Coxwell occurred less than 48 hours after he was arrested for domestic violence.  And the domestic violence incident precipitating that arrest was recent enough that Samaria was still visibly bruised.  This sequence of events was close in time — not at all remote.

2.   The Domestic Violence Evidence Was an Essential Part of the Story

Moore contends that the domestic violence evidence was irrelevant because it was unrelated to the October 30, 2017 events.  But it was related.  The domestic violence evidence was a crucial part of the story that had a direct bearing on Moore's justification defense.  Without it, there would have been no context for the jury to understand what happened on the night that Moore possessed the firearm and shot Coxwell.  The jury would not have understood why Howle showed up at Samaria's house that night, why Coxwell was involved in the situation, or why and how Coxwell entered the house with a key.

As Moore's counsel said in his opening statement, this was a "messy situation."  The domestic violence evidence was part of the mess that "pertained to a chain of events forming the context, motive, and set-up of the crime," *United States v. Mills*, 704 F.2d 1553, 1559 (11th Cir. 1983), and led to Moore's assertion of an affirmative defense to that crime.  It had everything to do with whether Moore

himself contributed to creating the volatile situation that led to his illegal possession of the firearm. That means it was closely connected to his justification defense. And the district court did not abuse its discretion in admitting it.

### E. The District Court Acted Within Its Discretion When It Refused to Allow Defense Counsel to Ask Samaria if She Had Told Moore That Howle Had a Juvenile Conviction in Texas for Murder

Moore contends that the district court abused its discretion by refusing to let him ask Samaria about Howle's alleged juvenile conviction even though he had no evidence of that conviction. He argues that it was "nearly impossible" to get that evidence because it involved a juvenile case in another state. He asserts that he wasn't offering it for the truth of the matter, but instead under Rule 404(b) to show his own knowledge and state of mind. Moore asserts that his knowledge of Howle's prior violent act was important to his justification defense.

The existence of Howle's alleged juvenile conviction was purely speculative, and the court had broad discretion to exclude references to it. *See Yellow Pages Photos, Inc. v. Ziplocal, LP*, 795 F.3d 1255, 1276 (11th Cir. 2015) (holding that the district court did not abuse its discretion in excluding a witness's testimony because it "was pure speculation, and thus too attenuated to be relevant"). Moore cannot establish that it would have had any bearing on his state of mind anyway because he repeatedly testified that he did not know Howle had returned at the time of the shooting and

didn't expect Howle to return. Whatever Moore had been told about Howle was irrelevant if Moore didn't believe Howle was at the house.

And in any event, excluding questions about a juvenile conviction for murder, for which there was zero evidence, was harmless because it was speculative. *See United States v. Sellers*, 906 F.2d 597, 602–03 (11th Cir. 1990) (concluding that the exclusion of a "rather murky proffer of evidence" about who said what to whom was harmless).

### F. The District Court Acted Within Its Discretion When It Answered a Question from the Jury

Moore contends that the district court erred in answering a question from the jury. During deliberations, the jury asked the court two questions. The first was: "(1) Do all four of the admissions have to be true to prove his innocence?" The second was: "(2) Can a convicted felon reside in a house with a weapon?"

#### 1. The First Question

The district court said this about question number 1, which involved the elements of Moore's affirmative defense:

> So as to question number one, my thought would be to say, yes; in order to find the defendant sustained his burden of proof on the defense of necessity, you must be satisfied that he has proved all four elements set out in the jury instruction by a preponderance of evidence as defined in that instruction.

Both sides agreed to that without any further discussion.

### 2.    The Second Question

The court asked both sides for "suggestions" about how to answer question number 2, which involved whether a convicted felon could reside in a house where there was a firearm.  At first, defense counsel wanted the court to answer it simply: "yes."  The court was concerned that answering it that way would draw too much attention to an irrelevant issue about possession of the firearm.  After further discussion about what to say (covering 7 pages of the transcript), the court proposed this answer: "You have received all of the testimony, evidence, and applicable law necessary to reaching a verdict.  You should focus on the instructions you have and apply them to the facts as you have determined them to be."  Both sides agreed to that.

Now Moore contends that the court erred by not answering the question with a simple "yes."  He argues that the court's response failed to answer the jury's question in the "context of the case" and that the question bore directly on his justification defense.

Even if we assume that Moore's initial argument for a "yes" preserved his objection to the court's proposed answer that he ultimately agreed to (enabling him to avoid plain error review), there's no abuse of discretion here.  Moore admitted to possession. There was no dispute that he grabbed the gun and shot Coxwell. The court considered the parties' arguments and balanced the risk

of introducing confusion where possession of a firearm was not at issue in the trial. The government had not argued that Moore's mere presence in the house with the firearm made him guilty of the charged offense or negated his justification defense.

Moore didn't object to the jury instructions, and the court did not err by referring to those previous instructions. *See United States v. Bailey*, 830 F.2d 156, 157 (11th Cir. 1987) (rejecting the argument that "the judge erred by referring the jury back to the earlier jury instructions rather than directly responding to the jury's questions"). "District courts have considerable discretion regarding the extent and character of supplemental jury instructions," so long as those instructions do not "misstate the law or confuse the jury." *United States v. Joyner*, 882 F.3d 1369, 1375 (11th Cir. 2018). The court properly avoided confusing the jury by refusing to inject new issues into the case. *See id.* at 1376. Moore has shown no error based on the court's answer to the jury's question.

### G.    Both of Moore's Challenges to the Calculation of His Guidelines Range Fail

Moore's two sentence challenges have no more merit than his challenges to his conviction.

He contends that the court should have reduced his base offense level by two points for acceptance of responsibility. He also contends that the court clearly erred by adding four levels to his base offense level because he possessed a firearm while committing felony assault. He doesn't argue that a felony assault didn't happen

when he grabbed the firearm the law prohibited him from possessing and shot Coxwell — only that it didn't count because he was acting in self-defense.  We address each of those sentence challenges in turn.

1.    The District Court Did Not Clearly Err by Denying Moore a Two-Point Reduction for Acceptance of Responsibility

Moore contends that, even though he went to trial, put the government to its burden of proof, and asserted a justification defense, he was entitled a two-point reduction to his base offense level for acceptance of responsibility.  He relies on this application note to the relevant guideline:

> This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse.  Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction.  In *rare situations* a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial.  This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility

> will be based primarily upon pre-trial statements and
> conduct.

U.S.S.G. § 3E1.1 cmt. n.2 (emphasis added).  Moore argues that by raising a justification defense, he was not challenging the government's evidence on the felon in possession charge.  But he made the government prove that charge. Only after the government rested its case did Moore acknowledge that he had possessed the gun.  He also put the judge and jury through a trial.

We review only for clear error the factfindings on which a district court bases its denial of an acceptance of responsibility reduction.  *United States v. Mathews*, 874 F.3d 698, 709 n.7 (11th Cir. 2017).  We will not set aside that denial "unless the facts in the record clearly establish that the defendant has accepted responsibility."  *United States v. Moriarty*, 429 F.3d 1012, 1022–23 (11th Cir. 2005).  The facts show that Moore didn't accept responsibility.  He didn't admit that he possessed the gun until he had no other option based on Samaria's testimony, and even then, he tried to say that "[i]n a way" they both possessed the gun.  He was evasive when testifying on cross-examination, and the court had to remind him 15 times to answer the question he had been asked.  There was no error, much less clear error, in the court's finding that Moore had not accepted responsibility.

2.  The District Court Did Not Clearly Err by Enhancing Moore's Base Offense Level on the Ground that His Possession of the Firearm Was in Connection with Another Felony Offense

The Presentence Investigation Report recommended increasing Moore's base offense level by four because he possessed the firearm in connection with another felony offense, which was felony assault. Moore disputes that there was a felony assault, arguing that he acted in self-defense under Alabama law. The district court rejected the argument that Moore had acted in self-defense and applied the enhancement. It found that Coxwell had contributed to some extent to the violent encounter but also found that Moore's actions were not justified, as the jury had decided when it rejected his justification defense.

"A district court's determination that a defendant possessed a gun 'in connection with' another felony offense is a finding of fact that we review for clear error." *United States v. Martinez*, 964 F.3d 1329, 1333 (11th Cir. 2020) (quotation marks omitted). Under Alabama law, assaulting a person with a deadly weapon is a felony. Ala. Code § 13A-6-21(a)(2), (a)(3), (b). It is true that one potential defense to that crime involves Alabama's "stand your ground" statute that does away with the common law duty to retreat if a person is lawfully in a home where he is entitled to be, as Moore was. *See id.* § 13A-3-23(b). In addressing a felon in possession situation, however, the Alabama Court of Criminal Appeals has explained:

> [A] person should not be able to unlawfully take possession of a weapon well before an altercation occurs, enter circumstances that may result in a violent confrontation, use that weapon in a violent altercation, and then avail himself or herself of the "no-duty-to-retreat" right created by § 13A-3-23(b). In such a situation, the defendant is engaged in unlawful activity before it becomes necessary to do so. As such, the defendant who is illegally in possession of a firearm should be required to retreat, if retreat is possible.

*Fuller v. State*, 231 So. 3d 1207, 1216 (Ala. Crim. App. 2015). The court went on to say that "[w]e certainly do not believe the Alabama Legislature intended to avail armed violent felons of its stand-your-ground law." *Id.* at 1217.

Based on the facts presented at trial, the district court did not clearly err in finding that Moore had not established self-defense as a justification for shooting Coxwell. For all the reasons already discussed, the evidence showed that Moore escalated the situation and interposed himself when Samaria was attempting to handle it. He claimed his actions were justified because he had to defend himself, but it was Moore who had insisted that Samaria get her gun when she did not want to; she wanted to see who was outside and resolve the situation herself. Moore also could have called 911 and asked that law enforcement officers be sent to the house.

It wasn't clear error for the district court to find that Moore, a convicted felon, had possessed a firearm in connection with another felony offense.

38                    Opinion of the Court                    21-12291

AFFIRMED.