[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

———————————————

No. 22-11105

Non-Argument Calendar

———————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

KEON MOORE,

Defendant-Appellant.

———————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:20-cr-00180-TPB-AAS-1

———————————————

Before JORDAN, JILL PRYOR, and BRANCH, Circuit Judges.

PER CURIAM:

Keon Moore appeals his convictions for possessing a firearm and ammunition as a convicted felon and for possessing with intent to distribute methamphetamine, cocaine, and marijuana. Moore raises two issues on appeal. First, he says that the district court abused its discretion when it admitted into evidence several social media posts and messages. Second, he says that the district court abused its discretion when it denied his motion for a mistrial after a witness testified that papers found in Moore's storage unit belonged to a burglary victim. After careful review, we reject both of Moore's arguments. Accordingly, we affirm his convictions.

**I.**

The charges in this case arise out of Moore's rental of a storage unit at a Public Storage facility in Bradenton, Florida. In January 2020, Moore rented a 50 square-foot unit. At the time Moore rented the unit, he provided Public Storage with his driver's license, telephone number, and email address.

Moore signed a rental agreement governing his use of the storage unit. The agreement required Moore to use a lock to secure his unit. It also provided that if criminal activity was suspected in the unit, Public Storage or police could remove the lock and enter the unit without providing notice or seeking Moore's consent. In addition, the agreement stated that Public Storage could terminate

the agreement if it had reason to believe that Moore was engaged in criminal activity.

After renting the unit, Moore visited the facility nearly every day. He usually stayed at the unit for between 15 and 20 minutes.

About three weeks after Moore rented the unit, the facility manager, Grace Marchena, conducted a unit audit. As part of the audit, she inspected the entire facility to see whether any units were damaged, were missing locks, or had been abandoned. At the time Marchena conducted the audit, Moore was at the facility, sitting in his car in the parking lot about 20 feet from his unit.

During the audit, Marchena saw that the door to Moore's unit was closed and its lock was missing. She attempted to enter the unit to verify that its contents were intact. When Marchena pushed on the unit's door, she encountered resistance from someone inside. She eventually was able to open the door and saw a man and a boy who appeared to be about 12 years old. Marchena observed that the unit was relatively empty but noticed some small boxes and a gun bag.

Marchena asked the man what he was doing there. The man, later identified as Kevin Ross, responded, "I'm using my unit." Doc. 155 at 219.[1] After this brief exchange, Marchena continued her audit. She saw Ross and the child leave the facility in Moore's vehicle. No one returned to Moore's unit for several days.

---

[1] "Doc." numbers refer to the district court's docket entries.

Marchena was concerned about what she had seen and contacted police. She returned to the unit to photograph its contents. Because the unit was locked, she had to position her camera in the space between the building's roof and the unit's wall. The photograph showed that the gun bag was still in the unit.

Law enforcement investigated Marchena's report. Officers brought a drug detection dog to the facility. The dog alerted to the presence of drugs in Moore's unit. Police then secured a warrant to search the unit.

When officers searched Moore's unit, they found a backpack, a tin full of narcotics, a box filled with marijuana, and a gun case with two rifles inside. Officers opened the backpack and discovered several loaded handguns, an extended round magazine, and a do-rag or skullcap. In the backpack, officers also found paystubs for an individual named Cory Smith. From the unit, officers seized approximately 1.7 kilograms of marijuana, 45 grams of methamphetamine, and 34 grams of cocaine, as well as crack cocaine, fentanyl, morphine, and eutylone.

After police searched the storage unit, Public Storage notified Moore, by email and text message, that it had terminated the rental agreement. Moore immediately called the facility. After this phone call, Marchena notified the police that Moore was on his way to the facility. When Moore arrived at the facility about 20 minutes later, police arrested him. At the time of his arrest, Moore was carrying a key to the lock that had secured the storage unit. He

also had two cell phones. One of the cellphones had the same number that Moore had provided when he rented the unit.

Moore was charged with being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1) (Count One); possessing with intent to distribute a controlled substance, in violation of § 841(a)(1) (Count Two); and possessing a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c) (Count Three). In Count Two, the government alleged that the controlled substances involved were methamphetamine, cocaine, crack cocaine, fentanyl, eutylone, morphine, and marijuana. Moore pled not guilty to the charges.

The case proceeded to trial. At trial, the government called several witnesses. Marchena testified about renting Moore the unit and what she saw during the unit audit. Law enforcement officers testified about their investigation and Moore's arrest.

The government introduced additional evidence tying Moore to the storage unit. The jury heard a recording of a phone call that Moore made from jail while awaiting trial, in which he complained about the search of the storage unit. On the call, Moore admitted the items in the storage unit belonged to him, stating "that was . . . my property." Doc. 132-27 at 6. In addition, the government presented evidence that while Moore rented the storage unit, calls from his cell phones originated in the area near the storage facility. And the jury heard that Moore's DNA was consistent with DNA found on the do-rag recovered from the storage unit.

At trial, the government also introduced evidence of Moore's social media communications—posts he made on Instagram and messages he sent through Facebook and Instagram—to show that he possessed the drugs, firearms, and ammunition found in the storage unit and that he used firearms in connection with his drug-trafficking operation. Initially, the government sought to introduce posts and messages made over a several-year period. Moore moved to exclude the evidence, arguing that the communications were inadmissible because they were irrelevant and more prejudicial than probative. After the district court expressed concern that at least some of the communications were inadmissible, the government narrowed the group of communications it sought to introduce into evidence.[2] The district court ultimately allowed the government to introduce some, but not all, of these communications.

At the trial, the jury saw posts from Moore's Instagram account advertising that he was selling marijuana. It also saw messages from Facebook and Instagram in which Moore discussed buying and selling marijuana, methamphetamine, cocaine, and oxycodone. The government introduced communications Moore made about Xanax, too. In two Instagram posts, Moore asked whether anyone had "deals" on "bars" or "zans," meaning Xanax. Doc. 132-25 at 1–2. Moore made these posts in April 2019, approximately

---

[2] Even after the government agreed to narrow the universe of posts and messages it sought to introduce, Moore continued to object to the admission of some of the communications.

nine months before he rented the storage unit, and no Xanax was found in the unit.

The jury also heard that Moore exchanged messages on Facebook and Instagram about firearms. About four months before he rented the storage unit, Moore exchanged messages with another person who tried to sell him an AR-style rifle. Two AR-15s were found in the storage unit. In another message, sent approximately three weeks before he rented the storage unit, Moore mentioned that he had a "brown . . . glock 23 40." Doc. 132-24 at 27. A few weeks later, police found a brown .40 caliber Glock in the storage unit. On another occasion, while he was renting the storage unit, Moore exchanged messages about meeting with members of another group with whom he had a disagreement. In these messages, Moore warned that the other group should not bring guns to the meeting because he had "plenty" of weapons of his own. Doc. 132-25 at 33.

The government also introduced Facebook messages that Moore exchanged with Isiah Hunt. These messages were introduced to show that Moore used firearms in connection with his drug dealing. While he rented the storage unit, Moore fronted drugs to Hunt with the understanding that Hunt would repay him with the proceeds from selling the drugs. Hunt messaged Moore about purchasing marijuana, methamphetamine, and cocaine.

In late January 2020, Hunt was injured in an automobile accident. After the accident, Hunt found himself short on cash and was unable to repay Moore about $90. Hunt sent Moore messages

begging for extra time to pay his debt. Hunt acknowledged that in the past he had tried to "duck and dodge" to avoid paying Moore. Doc. 132-24 at 9. But he promised not to take this approach because he knew what Moore was "capable of." *Id.*

Moore insisted that Hunt pay him. Concerned that Moore would use force to collect the debt, Hunt told Moore that he lived next door to a police officer and the "[l]ast thing" he needed was for Moore "to catch a charge tryna shoot at [his] crib and . . . murder somebody." *Id.* at 11. Hunt warned that if Moore showed up at his home, he would go "knock on [the police officer's] door." *Id.*

Moore's primary defense at trial was that the government had not met its burden of proof to show that he possessed the drugs, guns, and ammunition found in the storage unit. Anticipating that Moore might try to point the finger at Cory Smith, the person whose name appeared on the paystubs found in the backpack, the government elicited testimony from an officer that the paystubs belonged to "a victim of a burglary." Doc. 156 at 68. After the officer gave this testimony, Moore moved for a mistrial. The district court denied the motion, stating that the testimony was "not particularly relevant" and that Smith was "not part of [the] case." *Id.* at 68–69.

In closing arguments, the government argued that it had proven beyond a reasonable doubt that Moore knowingly possessed the drugs, guns, and ammunition found in the storage unit and thus was guilty of Count One (possessing a firearm or ammunition as a convicted firearm) and Count Two (possessing with

22-11105          Opinion of the Court          9

intent to distribute a controlled substance). The government also argued that it had proven beyond a reasonable doubt Moore's guilt on Count Three (possessing a firearm in furtherance of a drug-trafficking crime). In its closing argument, the government mentioned Hunt's messages, saying they showed Hunt understood that Moore used guns in connection with drug dealing—evidence that Moore was guilty of Count Three.

Ultimately, the jury convicted Moore of some, but not all, the charges. It found him guilty of Count One and Count Two but not guilty of Count Three. On Count Two, the jury found that the controlled substances involved were five grams or more of methamphetamine and unspecified quantities of cocaine and marijuana. It did not find that the drug-distribution offense involved crack cocaine, fentanyl, eutylone, or morphine. The district court imposed a sentence of 210 months.

This is Moore's appeal.

## II.

We generally review a district court's evidentiary rulings "for a clear abuse of discretion." *United States v. Dodds*, 347 F.3d 893, 897 (11th Cir. 2003). We review the denial of a motion for a mistrial for an abuse of discretion. *See United States v. Grzybowicz*, 747 F.3d 1296, 1311 (11th Cir. 2014).

Even when a district court makes an erroneous evidentiary ruling, "we will not reverse if the government meets its burden of showing that the error is harmless." *United States v. Moore*, 76 F.4th 1355, 1367 (11th Cir. 2023). Reversal is warranted only when an

"error resulted in actual prejudice because it had substantial and injurious effect or influence on the jury's verdict." *Id.* (internal quotation marks omitted). In our harmless error analysis, we can consider the "overwhelming evidence of the defendant's guilt that exists regardless of an erroneous evidentiary ruling." *Id.*

A mistrial is appropriate "upon a showing of substantial prejudice." *Grzybowicz*, 747 F.3d at 1311 (internal quotation marks omitted). To establish that a mistrial was required, the defendant must demonstrate that "there is a reasonable probability that, but for the alleged error, the outcome of the trial would have been different." *Id.*

### III.

On appeal, Moore argues that the district court abused its discretion when it (1) allowed the government to introduce his social media communications into evidence and (2) denied his motion for a mistrial after an officer testified that the paystubs found in the backpack belonged to a burglary victim. We address each issue in turn.

### A.

We begin with Moore's argument that the district court abused its discretion when it admitted into evidence social media posts showing that Moore distributed Xanax. He also maintains that the district court abused its discretion when it admitted into evidence messages from Hunt. Moore argues that these communications should have been excluded under Federal Rule of Evidence 404(b) because they were inadmissible evidence of prior bad acts or

under Rule 403 because they were more prejudicial than proba-tive.[3]

　　We assume Moore is correct that the district court abused its discretion in admitting both groups of communications. We nevertheless conclude that any error was harmless. For the counts on which Moore was convicted, the key question was whether Moore possessed the drugs, firearms, and ammunition found in the storage unit. Here, the government's evidence of possession was overwhelming. The government showed that: (1) Moore rented the storage unit where the drugs, guns, and ammunition were found; (2) after renting the storage unit, Moore visited the unit al-most every day; (3) cell-site data confirmed that Moore frequently visited the storage unit; (4) Moore's DNA was consistent with the DNA found on the do-rag from the backpack; (5) Moore was car-rying a key to the storage unit's lock when he was arrested; (6) Moore exchanged messages on social media about buying and selling marijuana, methamphetamine, and cocaine (substances found in the storage unit); (7) a few months before his arrest, Moore discussed purchasing an AR-style weapon (two AR-style weapons were found in the storage unit); and (8) a few weeks be-fore his arrest Moore mentioned that he had a brown .40 caliber

---

[3] The government suggests that we should review these issues under a plain-error standard because at trial Moore did not challenge the admissibility of all the social media posts the government sought to introduce. We need not re-solve whether Moore adequately challenged these specific posts in the district court because, even assuming that Moore did raise these issues, he is not enti-tled to relief under an abuse-of-discretion standard.

Glock (a type of weapon also found in the storage unit). On top of all this, the jury heard Moore admit in a recorded phone call that the items in the storage unit belonged to him. Given the overwhelming evidence that Moore possessed the drugs, guns, and ammunition found in the storage unit, we cannot say that the admission of Moore's communications about selling Xanax or Hunt's comments about Moore had a substantial and injurious effect or influence on the jury's verdict. *See Moore*, 76 F.4th at 1367. Thus, any error was harmless.

## B.

We now turn to Moore's argument that the district court abused its discretion when it denied his motion for a mistrial after the jury heard that a burglary victim's paystubs were found in the storage unit. Even assuming that it was improper for the jury to hear this testimony, the district court did not abuse its discretion in denying the motion for a mistrial. Given the overwhelming evidence of Moore's guilt, which we described above, we cannot say that there was a reasonable probability that the outcome of the case would have been different without the brief reference to the paystubs belonging to a burglary victim. *See Grzybowicz*, 747 F.3d at 1311.

**AFFIRMED.**