[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-10125

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

DIEUDRUCH EMMANUEL,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 9:21-cr-80181-RLR-1

_____

Before JILL PRYOR, NEWSOM, and ANDERSON, Circuit Judges.

PER CURIAM:

After a jury found appellant Dieudruch Emmanuel guilty of one count of conspiracy to possess with intent to distribute 100 grams or more of heroin, one count of possession with intent to distribute 100 grams or more of heroin, and two counts of possession with intent to distribute heroin, the district court sentenced him to 87 months' imprisonment. On appeal, he argues that the district court erred at trial when it admitted into evidence a recorded telephone call between Emmanuel and his wife. He also challenges the district court's decision at sentencing to apply a role enhancement. After careful consideration, we affirm.

## I.

This case arises out of an investigation into the distribution of heroin and fentanyl in the Palm Beach County area. In this section, we begin by describing the investigation and then review the procedural history of Emmanuel's criminal case.

## A.

The following facts are taken from the evidence introduced at Emmanuel's criminal trial. After a drug dealer was caught by law enforcement when he sold fentanyl to an undercover police officer, the drug dealer began to work with law enforcement as a confidential informant. Through the informant, who went by the code name of Mack, law enforcement conducted several controlled

purchases of heroin and fentanyl from Emmanuel and his brother, Richard Artur.

For the first controlled buy, which occurred in June 2019, Mack called Emmanuel and arranged to purchase heroin for $100. Emmanuel told Mack to meet him at an Applebee's restaurant. When Mack arrived at the restaurant, Emmanuel directed him to go to a different location. When Mack arrived at the second location, he met up with an individual, later identified as Max Durfille, who took his money and gave him the drugs.

A few days later, Mack called Emmanuel and arranged to purchase heroin for $300. Emmanuel told Mack to go to Cresthaven Road, where he would meet with Emmanuel's cousin who would be riding a neon green bicycle. When Mack arrived at the location, Durfille appeared on a green bicycle and completed the transaction. The substance Durfille provided contained fentanyl.

After this transaction, police officers followed Durfille, who rode his bicycle to a house that belonged to Artur. As part of their investigation, officers conducted surveillance on this house. They regularly saw Emmanuel, Durfille, and Artur there.

About a week after the second transaction, Mack called Emmanuel and arranged to purchase $1,100 worth of heroin. Emmanuel told Mack that his cousin would come in a black Cadillac to deliver the drugs. Durfille arrived in a black Cadillac and completed the transaction.

After the third transaction, Emmanuel changed his phone number, and Mack was no longer able to contact him. At law

enforcement's direction, Mack went to Artur's home, met with him, and obtained his new phone number.

In late July, Mack called Artur and arranged to purchase half an ounce of heroin for $1,250. Artur initially told Mack to come to his house to complete the deal. Artur then told Mack that he needed a few minutes, saying his person "with the shit," meaning his drug supplier, was at the hospital. Doc. 177 at 88.[1] A few hours later, Artur let Mack know that he was ready. Mack then went to Artur's house and purchased heroin. The next day, Mack purchased another half an ounce of heroin from Artur.

Around this time, law enforcement added an undercover officer to the operation. Mack introduced the undercover officer to Emmanuel and Artur as his uncle or "Unc."

Mack told Artur that Unc wanted to purchase an ounce of heroin. Mack and Unc drove to Artur's house to complete the transaction. When they arrived, Artur was sitting in a car in his driveway. Artur entered Unc's car and said that he didn't know Unc and would prefer to deal with Mack. Unc responded that he wanted to deal with Artur directly because he had to pay Mack for every transaction that Mack arranged. Artur relented and sold Unc an ounce of heroin. About a week later, Unc purchased another ounce of heroin from Artur.

Soon after, Mack called Emmanuel on a new phone number. On the call, Mack mentioned that Unc had been purchasing drugs

---

[1] "Doc." numbers refer to the district court's docket entries.

from Artur. He then asked, "You want me to hit you up instead of [Artur]?" Doc. 131-8 at 2. Emmanuel responded, "Bro, it don't matter." *Id.* Later, Emmanuel expressed concern about selling directly to Unc because Emmanuel did not know him. When Mack mentioned that Artur had sold to Unc, Emmanuel responded, "if [Artur] met with your uncle, that's on him. I ain't meeting nobody I don't know." Doc. 131-10 at 1. Emmanuel told Mack, "I ain't meeting your uncle, though. I don't give up control." *Id.* at 2. Emmanuel said that if Unc wanted to purchase anything from him, it would have to be through Mack.

A few days later, Mack called Emmanuel, seeking to purchase half an ounce of heroin. Emmanuel told Mack to call Artur to arrange the transaction, explaining that he was too far away to meet. Mack then called Artur and said that he was trying to purchase half an ounce from Emmanuel, but Emmanuel was busy and told him to call Artur. Later that day, Mack went to Artur's house and completed the transaction.

The next day, Emmanuel texted Mack to confirm that Mack had been able to purchase heroin from Artur. Mack reported that Unc wanted to purchase a larger amount of heroin, and Emmanuel told him to call Artur to set up the deal. Mack then purchased one ounce of heroin from Artur for $2,200.

A few weeks later Emanuel called Mack using another new phone number. When Mack commented that Emmanuel frequently changed phone numbers, Emmanuel responded, "I ain't trying to fuck you up or myself up. Remember?" Doc. 132-7 at 1.

Mack later contacted Emmanuel, saying that Unc wanted to purchase five ounces of heroin. Mack explained that Unc did not want to purchase from Artur because Artur's drugs were not strong enough and Unc was looking to purchase fentanyl. Emmanuel stated that he would provide the drugs to Mack but not Unc. Emmanuel told Mack, "Long as Unc ain't the police, Unc going to be happy fuck[ing] with me." Doc. 177 at 151.

Mack and Unc planned to meet with Emmanuel in person to obtain a sample before completing the five-ounce purchase. On the day of the meeting, Emmanuel and Artur spoke several times on the phone. Emmanuel told Artur to "[s]et the play up," meaning to be the one to be present at the drug transaction. *Id.* at 244. He offered to give Artur $1,000 for participating in the transaction. But Emmanuel warned Artur that Unc was unhappy with the drugs that Artur had previously supplied because they were too weak and too expensive. Emmanuel cautioned Artur that if they did not provide a high-quality sample Unc would not go through with the purchase.

Emmanuel then advised Artur on how to prepare a high-quality sample. He directed, "your best bet is to get some white shit" and then "mix it with . . . half of the shit you got and put the other half on the back burner." *Id.* at 246. Emmanuel instructed Artur to "take a cream from your stuff and . . . take another cream from my good stuff" and then "mix it." *Id.* at 249. In other words, Emmanuel was telling Artur to make the sample by combining Emmanuel's higher-quality supply with Artur's lower-quality

23-10125                Opinion of the Court                7

supply so that Unc would be satisfied with the sample. After agreeing to this plan, Artur and Emmanuel met up in person.

Emmanuel knew that Unc wanted him to be at the meeting where they provided a sample. But he told Artur that he would not go, saying "I'm not trying to meet." Doc. 134-10 at 1. Emmanuel stated that he was suspicious of Unc and was worried that police were surveilling them. He asked Artur whether Unc "look[ed] like a cop?" Doc. 135-1 at 7. Artur responded, "Hell nah." *Id.* Artur then vouched for Unc, saying he "look[ed] like a normal dude" and "don't be doing weird shit or nothing." *Id.* at 8.

When Mack and Unc learned that Emmanuel would not meet with Unc to provide a sample, Mack texted Emmanuel asking why he would not meet. Emmanuel responded, "Every time I gotta meet you weird shit is happening." Doc. 177 at 162. He then added, "I just hope Unc ain't them people," meaning law enforcement. *Id.* at 164.

Later that night, Artur, Emmanuel, and another individual met Mack at a restaurant and delivered the sample. When they met, Emmanuel questioned Mack about whether Unc was actually his uncle. Emmanuel told Mack that he would not meet with Unc, saying "Unc's not coming to get nothing from me, dog." Doc. 178 at 35.

After Unc accepted the sample, the parties moved forward with the transaction. Emmanuel and Mack negotiated over text message about price. Emmanuel initially offered $2,100 per ounce. Mack responded that the price was too high. Emmanuel ultimately

agreed to cut the price to $1,800 per ounce, for a total price of $9,000.

With the price set, Emmanuel then called Artur to discuss preparing the five ounces. Preparing the product involved mixing the drugs that Emmanuel and Artur already had with a cutting agent. Artur worried that even adding a cutting agent they did not have enough supply to make five ounces. Artur asked Emanuel whether he should add "that brown cut." *Id.* at 48. Emmanuel responded, "don't do that." *Id.* Emmanuel then instructed Artur to meet him at a barbershop after the transaction.

Mack and Unc went to Artur's home to complete the transaction. Just before Mack and Unc arrived, Emmanuel called Artur. He asked if Artur saw Mack and Unc, adding that they were calling him. He asked Artur if he was ready and told him to "stay in the car." *Id.* at 50. Emmanuel then called back to tell Artur that Mack and Unc were almost there.

When Mack and Unc arrived, they found Artur waiting for them in his car. Mack exited Unc's vehicle and walked to Artur's car. After speaking with Artur, Mack returned to Unc's vehicle. Artur followed. Artur then apologized to Unc for the quality of drugs that he had previously provided. Artur handed Unc a bag of heroin, and Unc handed him money. Unc used a scale to weigh the bag. Artur acknowledged that the bag was two grams short of five ounces, explaining that he had deducted the weight of the sample from the night before. After Artur counted the cash Unc gave him, he exited Unc's vehicle.

Artur then called Emmanuel to confirm that the transaction was complete. Emmanuel commented that both he and Artur had profited from the deal, saying, "See, I put you in that" and "I could have been greedy," but "I don't eat by myself." *Id.* at 51. Artur responded that Emmanuel had added him to the deal only because he was worried about meeting Unc face-to-face, saying "the only thing that saving me is you scared of the play." *Id.* at 52.

Later that day, Artur called Emanuel saying that he needed more heroin. He mentioned a customer who called him every weekend and asked Emmanuel for an additional half an ounce.

After the transaction with Unc, an issue arose because Unc had paid Artur $10,000, not $9,000.[2] Emmanuel told Artur that they needed to give Unc $1,000 back and keep him happy so that he would continue to purchase large amounts of drugs from them. Artur wanted to resolve the problem by giving Unc a $1,000 credit on his next purchase. But Emmanuel reminded Artur that Unc had been unhappy with their quality in the past and might not be willing to buy from them in the future. Emmanuel advised Artur that it was not worth losing Unc as a customer over $1,000.

Artur asked Emanuel to meet with Unc, saying he did not want "to deal with all that extra shit," meaning the back and forth of the transaction. Doc. 137-4 at 4. Although Emmanuel had

---

[2] The mistake apparently occurred because the agent handling the money for the transaction had given Unc $10,000 instead of $9,000.

negotiated the price, he refused to meet with Unc, saying "I don't play with things like that," referring to in-person meetings. *Id.*

Artur and Unc met at a local restaurant. Artur returned $1,000 to Unc. They then discussed working together in the future. Artur acknowledged that he had provided poor quality product in the past. But he promised, "from now on, it's not going to be garbage." Doc. 137-13 at 9. He stated that he knew "where that bad shit came from" and promised that he had a "new pipeline." *Id.*

Immediately after Unc left the restaurant, Artur called Emmanuel. Artur reported that Unc was going to make more purchases from them. Emmanuel responded, "We gonna eat, shorty!" Doc. 137-14 at 2.

## B.

A grand jury charged Emmanuel and Artur with drug trafficking offenses. Emmanuel was charged with conspiracy to possess with intent to distribute 100 grams or more of heroin, in violation of 21 U.S.C. § 846 (Count One); two counts of possession with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1) (Counts Six and Eight); and one count of possession with intent to distribute 100 grams or more of heroin, in violation of 21 U.S.C. § 841(a)(1) (Count Nine). The substantive offense charged in Count Six arose from the transaction in which Mack called Emmanuel to purchase half an ounce of heroin, but Emmanuel said he was too far away and had Mack buy from Artur instead. The substantive offense charged in Count Eight corresponded to the transaction when Emmanuel and Artur provided Mack with a sample the day

before Unc purchased five ounces of heroin. And the substantive offense in Count Nine corresponded to the transaction when Artur delivered five ounces of heroin to Unc.

Emmanuel pleaded not guilty. He was detained pending trial.[3] According to Emmanuel, there were no in-person visits at the jail where he was being held because of the COVID-19 pandemic. As a result, the only way he could communicate with his wife was to call her using the jail's phone or video conferencing system, both of which were recorded. When Emanuel called his wife from jail, a message at the start of the call reminded Emmanuel and his wife that the call was being recorded.

On one call, Emmanuel and his wife discussed the government's case against him. Emmanuel said, "I'm taking the plea." Doc. 137-19 at 1. When his wife asked why, he responded, "That shit's bad," and "I can't tell you over this phone." *Id.* Emmanuel then repeated, "cause it's bad. It's bad." *Id.* Emmanuel also stated, "I know how bad it is. I'm the one that listened to it, and I know how bad it is. You don't know how bad it is." *Id.*

Before trial, the government notified Emmanuel that it intended to introduce a recording of this call into evidence. Emmanuel moved to exclude the evidence, arguing that the conversation was covered by the marital communications privilege or spousal

---

[3] Initially, Emmanuel was released on bond. While on bond, Emmanuel was taken into custody by Immigration and Customs Enforcement and held in an immigration detention facility. At Emmanuel's request, the district court revoked his bond, and he was held in criminal custody pending trial.

testimonial privilege. He also argued that the evidence should be excluded because its probative value was substantially outweighed by the danger of unfair prejudice. *See* Fed. R. Evid. 403. After a hearing, the district court denied Emmanuel's motion to exclude.

The case proceeded to trial. The government called as witnesses law enforcement officers involved in the investigation, including the undercover officer who posed as Unc. The government introduced into evidence recorded phone calls and text messages (1) between Mack and Emmanuel or Artur, (2) between Unc and Emmanuel or Artur, and (3) between Emmanuel and Artur.[4] The government also played the recording in which Emmanuel talked with his wife about pleading guilty. Before playing this recording, the court instructed the jury that it should not hold the fact that Emmanuel was in custody at the time of the call "against him in any way." Doc. 179 at 19. The court also advised the jury that there were "multiple reasons a person charged with a crime might consider pleading guilty." *Id.* Ultimately, the jury found Emmanuel guilty of all counts.

After Emmanuel was convicted, a probation officer prepared a presentence investigation report ("PSR"). The PSR set the base offense level at 24. It then applied a four-level enhancement because Emmanuel was a leader in criminal activity that involved five or more participants or was otherwise extensive. With a total offense level of 28 and criminal history category of II, the PSR

---

[4] Officers obtained a wiretap for Artur's phone, which allowed them to capture calls and text messages between Artur and Emmanuel.

calculated Emmanuel's Sentencing Guidelines range as 87 to 108 months.

Emmanuel objected to the role enhancement. He argued that he did not direct or organize others and denied that the criminal activity involved five or more participants or was otherwise extensive.

The government argued that the enhancement applied. It asserted that the evidence introduced at trial established by a preponderance of the evidence that Emmanuel had a leadership role in the criminal activity.

At the sentencing hearing, the government introduced additional evidence to establish that the criminal activity involved five or more participants. The government pointed out that the evidence at trial showed that Emmanuel, Artur, and Durfille participated in the criminal activity. At the sentencing hearing, a Drug Enforcement Administration ("DEA") agent testified about the roles of Tyler Roman and Wood Cidera in the criminal activity. The agent explained that Roman moved kilogram quantities of heroin and fentanyl from California and Mexico into Florida. He testified that Roman supplied Cidera who in turn supplied Emmanuel and Artur.[5]

The agent also testified that Cidera was regularly in contact with Emmanuel and Artur. Surveillance showed that before the transactions when Unc or Mack purchased drugs, Artur would go

---

[5] Roman was indicted in a separate federal criminal case and pleaded guilty.

to Cidera's apartment. In addition, when Artur told Mack that he needed additional time to obtain the drugs because his supplier was in the hospital, Cidera was at a hospital. And phone records showed that during the investigation Cidera and Emmanuel exchanged over a thousand communications.

The district court overruled Emmanuel's objection to the role enhancement. It concluded that the government had proven by a preponderance of the evidence that Emmanuel was a leader and "exercised decision-making authority." Doc. 180 at 26. The court explained that he had set prices and determined "the components of what was sold." *Id.* He also "fully participated in the commission of the offenses" and used "lower-level individuals to complete the deals." *Id.* The court also mentioned that Emmanuel had directed other members of the organization to change their phone numbers to avoid detection by law enforcement. It found that the government had proven by a preponderance of the evidence that the criminal activity involved five or more participants. The court listed Emmanuel, Artur, Cidera, Durfille, and Roman as participants.

After applying the role enhancement, the court calculated Emmanuel's guidelines range as 87 to 108 months' imprisonment. It ultimately sentenced him to 87 months' imprisonment followed by four years of supervised release. This is Emmanuel's appeal.

## II.

We generally review a district court's evidentiary rulings "for a clear abuse of discretion." *United States v. Dodds*, 347 F.3d 893,

897 (11th Cir. 2003). Even when a district court makes an erroneous evidentiary ruling, "we will not reverse if the government meets its burden of showing that the error is harmless." *United States v. Moore*, 76 F.4th 1355, 1367 (11th Cir. 2023). Reversal for an evidentiary error is warranted only when the error "resulted in actual prejudice because it had substantial and injurious effect or influence on the jury's verdict." *Id.* (internal quotation marks omitted). In a harmless-error analysis, we may consider the "overwhelming evidence of the defendant's guilt that exists regardless of an erroneous evidentiary ruling." *Id.*

We review a district court's determination that a defendant is subject to a role enhancement as an organizer or leader for clear error. *United States v. Martinez*, 584 F.3d 1022, 1025 (11th Cir. 2009). "Clear error review is deferential, and we will not disturb a district court's findings unless we are left with a definite and firm conviction that a mistake has been committed." *United States v. Cruickshank*, 837 F.3d 1182, 1192 (11th Cir. 2016) (internal quotation marks omitted). We have explained that a district court's "choice between two permissible views of the evidence as to the defendant's role in the offense will rarely constitute clear error so long as the basis of the trial court's decision is supported by the record and the court did not involve a misapplication of a rule of law." *Id.* (alteration adopted) (internal quotation marks omitted).

### III.

Emmanuel raises two arguments on appeal. First, he challenges the district court's evidentiary ruling admitting into

evidence the recorded jailhouse telephone conversation with his wife. Second, he says that the district court clearly erred at sentencing by applying a role enhancement. We address each issue in turn.

### A.

We begin with Emmanuel's evidentiary challenge to the admission of the recorded conversation he had with his wife while in jail, in which he discussed pleading guilty and commented on the strength of the government's evidence. He argues that the district court should have excluded the recording because the conversation was privileged or because it was more prejudicial than probative.

As to the privilege argument, the marital-confidential-communications privilege protects "information privately disclosed between [spouses] in the confidence of the marital relationship." *Trammel v. United States*, 445 U.S. 40, 51 (1980). But this privilege applies only when spouses have a reasonable expectation of privacy in their communication. *See Pereira v. United States*, 347 U.S. 1, 6 (1954) (recognizing that the privilege does not apply to communications made in the presence of third parties).

The district court concluded that the conversation was not privileged because Emmanuel and his wife had no reasonable expectation of privacy in the phone call, which they knew was being recorded. On appeal, Emmanuel challenges this analysis, pointing out that at the time of the conversation, the jail where he was detained was not allowing in-person visits due to the COVID-19 pandemic. Under these unique circumstances, Emmanuel argues, we should treat the spousal communication as privileged even though

both Emmanuel and his wife were warned that the phone line was being recorded.[6]

Emmanuel also argues that the district court should have excluded the recording because it was more prejudicial than probative. Under the Federal Rules of Evidence, a district court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. We have described excluding evidence under Rule 403 as an "extraordinary remedy" that courts should "invoke sparingly." *United States v. Lopez*, 649 F.3d 1222, 1247 (11th Cir. 2011) (internal quotation marks omitted).

We need not decide whether the district court abused its discretion when it admitted the recording, however, because any error was harmless. Even without the evidence of Emmanuel's conversation with his wife, there was overwhelming evidence of his guilt. The jury heard the phone calls and saw the text messages that Emmanuel exchanged with Artur, Mack, and Unc in which he openly discussed his role in the drug trafficking operation and directed drug transactions. Given this evidence, we cannot say that the district court's admission of the recorded conversation between Emmanuel and his wife had a substantial and injurious effect or influence on the jury's verdict. *See Moore*, 76 F.4th at 1367.

---

[6] Emmanuel also suggests that the communication with his wife was covered by the spousal testimonial privilege. But that privilege does not apply here because Emmanuel's wife did not testify against him at trial. *See United States v. Singleton*, 260 F.3d 1295, 1297 n.2 (11th Cir. 2001).

**B.**

We now turn to Emmanuel's sentencing challenge in which he argues that the district court clearly erred in applying a role enhancement. The Sentencing Guidelines provide that a defendant is subject to a four-level enhancement if he "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S. Sent'g Guidelines Manual § 3B1.1(a).

To establish that a defendant was an organizer or leader, the government must show that he "exerted some control, influence or decision-making authority over another participant in the criminal activity." *Martinez*, 584 F.3d at 1026. When evaluating whether a defendant acted as an organizer or leader, courts consider the following factors:

> (1) exercise of decision making authority, (2) the nature of participation in the commission of the offense, (3) the recruitment of accomplices, (4) the claimed right to a larger share of the fruits of the crime, (5) the degree of participation in planning or organizing the offense, (6) the nature and scope of the illegal activity, and (7) the degree of control and authority exercised over others.

*Id.* (internal quotation marks omitted); *see* U.S.S.G. § 3B1.1 cmt. n.4. "There is no requirement that all the considerations have to be present in any one case." *United States v. Ramirez*, 426 F.3d 1344, 1356 (11th Cir. 2005). Rather, "these factors are merely considerations for the sentencing judge, who makes the factual

determinations for the applicability of the § 3B1.1 enhancement on a case-by-case basis." *Id.*

For the enhancement to apply, the government also must establish that the criminal activity involved five or more participants. For purposes of the enhancement, a participant "is a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1, cmt. n.1. A person "who is not criminally responsible for the commission of the offense," like "an undercover law enforcement officer," is not a participant. *Id.* When deciding whether the criminal activity involved five or more participants, a court may count the defendant himself as a participant. *See United States v. Caraballo*, 595 F.3d 1214, 1232 (11th Cir. 2010).

On appeal, Emmanuel challenges the district court's findings that (1) he was an organizer or leader and (2) the criminal activity involved five or more participants. We address each finding in turn.

Emmanuel argues that there was no evidence that he was an organizer or leader because the government's evidence connected him only to Mack, a paid informant. We disagree. The government's evidence at trial connected Emmanuel to Artur and Durfille, who were also participants in the criminal activity, and showed that he exerted control over them.

For example, Emmanuel exerted control over Artur in the transaction when Unc purchased five ounces of heroin. After Emmanuel negotiated the deal, he offered to pay Artur $1,000 to

participate in the transaction. Emmanuel then directed Artur about how to prepare the sample and mix their two drug supplies to convince Unc that he was purchasing drugs of a higher quality than what Artur had previously provided. After Unc received the sample and negotiated to purchase the full five ounces at a reduced price, Emmanuel again instructed Artur about how to mix their drug supplies and prepare the five ounces that would be delivered to Unc. It is true that Emmanuel was not present when Artur and Unc met for the transaction to exchange the drugs for money. But this was because Emmanuel was unwilling to meet Unc in person and instead made Artur attend in his place. And even though Emmanuel was not present, he still told Artur how to conduct the transaction. On top of that, on a phone call immediately after the transaction, Emmanuel discussed how he had generously allowed Artur to participate in the deal and share in the proceeds.

The evidence at trial also showed that Emmanuel exerted control over Durfille. For the first three transactions with Mack, Emmanuel negotiated the terms over the phone. Emmanuel then planned out the transactions by deciding when and where they would occur. But rather than meet Mack in person, Emmanuel sent Durfille to complete the transactions Emmanuel negotiated, at the times and places that Emmanuel had selected.

Based on this evidence, Emmanuel exerted some control, influence, or decision-making authority over Mack and Durfille. Accordingly, we cannot say that the district court clearly erred when

it concluded that Emmanuel acted as an organizer or leader of the criminal activity.

Emmanuel also challenges the district court's finding that the criminal activity involved five or more participants. He says that the district court failed to adequately articulate its findings because it never named the five people who were participants. The record roundly refutes Emmanuel's position. The transcript from the sentencing proceeding shows that the court named each individual who was a participant, listing Emmanuel, Artur, Cidera, Durfille, and Roman.

Emmanuel also argues that the record does not support a finding that there were five or more participants. But, as we explained above, the evidence introduced at trial showed that Artur and Durfille both participated in the criminal activity. On top of that, the DEA agent's testimony at sentencing established that Roman and Cidera, who supplied the drugs sold to Mack and Unc, also were participants. We therefore cannot say that the district court clearly erred in finding that the criminal activity involved five or more participants.

## IV.

For the above reasons, we affirm Emmanuel's convictions and sentence.

**AFFIRMED.**